Case number 23-5786 Karen Roundtree v. AVI Foodsystems Inc et al. Oral argument not to exceed 15 minutes per side. Abigail Lewis for the appellant you may proceed. Thank you. Have you reserved some time for rebuttal? Yes, two minutes. Thank you. Thank you. May it please the court. Plaintiff Appellant Karen Roundtree brought causes of action against her former employer AVI Foodsystems Incorporated and her former flight manager, Defendant Appellant Cameron Pullins, arising out of their response to a sexual battery that Roundtree endured at work and the subsequent events that happened after that. At the district court a summary judgment was granted and the district court erred in granting summary judgment on the Kentucky Civil Rights Act claims and in awarding costs to the defendants. Concerning the Kentucky Civil Rights Act claims there are three reasons that the district court's decision should be reversed. First, Roundtree sufficiently established for her sexual harassment and hostile work environment claim against AVI. Second, Roundtree sufficiently established her retaliation claim against both AVI and Pullins. And third, Roundtree sufficiently established her gender discrimination claim against AVI. First, concerning the Kentucky Civil Rights Act sexual harassment and hostile work environment claim, the factors that go into that are whether Roundtree was a member of a protected class, whether she was subjected to unwelcome harassment, whether the harassment was based upon sex, or whether the harassment created a hostile or offensive work environment, and whether the employer knew or should have known about the harassment and if their response was prompt and appropriate. And the district court found that Roundtree did not meet the fifth element. So I looked at your, what I thought was the main case you cited on that fifth element, which was Hawkins, and it strikes me that there was a lot more information about the culprits' prior bad acts that the employer was privy to in that case. So it strikes me as pretty obviously distinguishable. I'd be curious if you had, what do you think is your best case that would suggest the response here, the 24-hour response was unreasonable? Well, this is rather unique because they definitely prioritized getting it done quickly over getting it done right. Let's see. I am not sure that I have a case to pull off right, and that is really comparable in that instance. I know in Jackson v. Quennex, that supports that to be prompt isn't enough. You also have to respond in an appropriate manner. And as far as how they should have responded is how they responded the second time, because there were two issues here. There was the first one where Cody came up behind Roundtree and forcefully pushed her fingers against the pants that Roundtree was wearing, forcing the fabric and her fingers into Roundtree's anus. And then the next day when Cody showed up again and made a threatening, suggestive gesture towards Roundtree. And what AVI did the second time was they alerted airport security because this wasn't an airport. So Cody was able to clear the TSA in order to get back into somewhere where she was supposed to have been banned. AVI personnel had to sign her in even, and they didn't know she had been banned. The temp agency wasn't told why she had been banned. So that's all what they messed up with the first time around. But then the second time around, they did alert security. They did alert AVI employees. They did alert the temp agency. Brian Plyman even sent an email to the temp agency, acknowledging how traumatic Cody coming back had been for Roundtree. And this connects to Roundtree's report of that second instance. But it's not a be perfect test. It's a be reasonable test, as I understand the law. Why do you think it was unreasonable to think if you called a temp agency and tell them never have your employee come back, and that seemed to have worked in all prior instances, that that wasn't sufficient in this instance to qualify as reasonable, even if not perfect? Yes. So in the past, they had never had an event like this. This wasn't a run of the mill problem employee. This was a violent assault. And this shouldn't have been treated like a run of the mill. Okay, let's put them in the list of someone we shouldn't have back again. This was a security risk. And Hawkins is a case where they did take it seriously. They had security escort the personnel the first time. They even offered the victim some security services. So I mean, you do have to react more strongly when the situation is, you know, a more serious misconduct that hurt your employee. Does your claim, the hostile work environment claim, does it depend on whether AVI violated its own internal reporting policy? It doesn't completely hinge on it, but that is a factor supporting it. So apart just from its policies, which it did violate, it didn't contact HR right away. It never called the hotline like it was supposed to. And then it's like what I said about just the common sense things that it should have done that it didn't do. One issue was it agreed to keep things confidential, and it didn't. And that has been considered a supporting factor. Let's see here. In EEOC versus Harvard year again, a broken promise of confidentiality can be considered a supporting factor. But yes, so whether they failed to take prompt and appropriate corrective action, they didn't alert airport security that a security risk couldn't come in. I think that makes it pretty simple. We move on to the... Do you think they should have... I agree with you that maybe it should depend on the underlying conduct. I mean, this conduct was in some respects criminal. It was a criminal assault. Do you think that there was a duty to call the police, notify the police that a potential crime had happened on the premises? Yeah, that would definitely have been in the best interest of their employee and would have been a factor that would have helped them in the analysis that they didn't do, another common sense. But in some respects, it depends on... I would think it would depend on the victim's preferences. Does your client ever suggest that the police should be involved? Her priority was wanting to feel safe at work and wanting Cody to never be able to come back. And after the first instance, she trusted Pullens and Akeridge and Plyman that they had taken care of it. And when she came in the next day, and Cody made that threatening gesture to her, the second report was completely different. When she called and she chewed out Akeridge and Pullens and Plyman about how poorly they had handled all of this. So she wasn't being cooperative anymore. She was angry and hurt, and she didn't feel safe anymore. And in order to feel safe, Plyman agreed to provide her with written notice that Cody would not return. He sent an email to the temp agency that day saying she had been traumatized and that she needed written confirmation in order to come back to work. Two hours later, the temp agency sent him that, and he never sent it to Roundtree. He had that the whole time. He knew that that was what Roundtree was waiting on to come back for work. He had said he'd provide that to her, and he never did. They leaned on this excuse of the no-call, no-show policy. If you actually go and look at that policy, there were blanks where ABI was supposed to fill in who she was allowed to call, and they didn't fill anything in. So they're essentially saying there's no way she could have been a no-call, no-show. But all the no-call, no-show stuff doesn't even really matter when you look at the voicemail from Heather Migliosi from the 28th, which was after. She wasn't calling every day, but they knew why she was out. She was out because she was waiting on that written confirmation that she had been promised. And Heather Migliosi of HR left her a voicemail saying, I need to hear from you, or Plyman needs to hear from you by the end of today to tell us what your intentions are with regard to your job. And Rountree did text Plyman by the end of the day saying, Ryan, I am not resigning. Please tell HR. Heather Migliosi's voicemail didn't invoke the no-call, no-show policy and that it had to be a phone call. She just said, we need to hear from you by the end of the day. And they heard from her by the end of the day, and they still fired her. So given that they took the position that if she just did what Ms. Migliosi said, she could still have her job, they can't lean on this manufactured excuse of, oh, this no-call, no-show policy right after they didn't follow the sexual harassment policy where they were meant to call a hotline to report it. They just didn't email. They think that's good enough, but they don't think that Rountree's text messages or the fact that Plyman simply knew why she wasn't there was enough on her end. Can you point me to or explain to me the clearest language in the record that says that, is it Plyman's, if I think I'm pronouncing it correctly, knew that she was waiting to get a written confirmation? Yes. Okay. It is record entry 26-15, page ID number 304. And that is the email from Mr. Plyman to the temp agency people. And it says, the AVI employee that was sexually harassed by Hope on Monday was traumatized this morning that Hope showed up to DHL to work. In order for her to return, she wants assurances in writing that Hope will not return to DHL or any other AVI account that she may work in ever again. Do you think you can provide me a letter or email from you assuring her that you have talked to Hope about never working at AVI ever again? I'd appreciate it if you could do that soon so I can assure her that she is safe at work from Hope. Two hours later, the temp agency complied. He never passed it along to Roundtree. He admitted in his deposition, he never passed it along to Roundtree. Why didn't she just call him back and say, and ask for a status check? What I don't understand is what was the end game? Your client wasn't going to come back into work until she got this. They were repeatedly asking her to call. Even if she didn't resign, at some point, you're going to have to communicate and say why I'm not coming into work. You're not going to just now come into work indefinitely. Yeah, she was communicating via text message. This really hinges on they are exaggerating by saying that since she didn't call, she wasn't communicating. Is there more than the one text saying I'm not going to resign? Yes. This happened on a Tuesday, then the Wednesday is when Cody came back. The next day is when Miss Roundtree actually tried to call Mr. Clemon, and he didn't answer. She followed up with a text. That is one instance where she tried to call him. She'd already been approved by Anchorage to have the next few days but- I really met on the back end. At the next week, it's a Wednesday, I believe, or Thursday. I can't remember. There were repeated calls to her. She says, I am not resigning. Was there any additional texts around that time? She let her supervisor know that she would not be in on Monday. For her. From her perspective, it was just, okay, they know that I'm not coming in because I don't have this letter yet. She's trying to get her ducks in a row to set things up for that following week, assuming that Mr. Clemon would send her the documentation she'd requested, and he hadn't. She was waiting on the documentation. Is there anything in the record as to how AVI treated or implemented this texting versus calling policy with other employees, as opposed to Ms. Roundtree? The most comparable thing is that the sexual harassment reporting policy for the managers which applied- may I continue to answer your question? I'm out of time. Yes. Okay. Yes. Mr. Clemon and Mr. Carrick had to go by the management policy where they were required to call and report sexual harassment, and they didn't call. They sent an email. If they're going to hold Ms. Roundtree to a different standard than they held the men, then that goes towards gender discrimination, and that also goes towards pretext. I'm sorry. Can I just follow up with a quick question? There's no evidence as to how the company treated other employees regarding taking off and calling in versus texting. In that instance, there's no other situation like that in the record. Is that correct? Not in that specific one, correct, but as I mentioned earlier, the form was incomplete. She didn't actually have any information of people she was allowed to call to abide by that policy. I would like you to take a moment to address the definition of indigent regarding the cost bill. Okay. Tell me what is that definition, and why does your client qualify? Yes. I am aware that you were on the bank's case. Yes. Well, she submitted an affidavit that she had less than $100 on her bank account already working 50-plus hours a week working paycheck-to-paycheck, and that she could not afford that. That is how I can apply it to the situation. I don't have a word-for-word good definition for you in front of me for indigency, though. Okay. Thank you. You'll have your rebuttal time. Thank you. Brian Anderson. Good afternoon, Your Honors. One of the points that Ms. Lewis made repeatedly in her oral argument is that Brian Plyman did not call HR as required by ABI policy. That's false. It's directly in the record that he first learned at 11.53 a.m. from an email from Erica Bussell that this allegation had been made. That's in the record at page 301. He then testified, page 299 of the record, that he called HR. In fact, there is documentary evidence because at 2.19 p.m., we see an email on October 19, 2021, the day it was reported, from Jen Sapp to Hegler Migliozzi, which says, Brian Plyman from DHL called about an allegation of sexual harassment made by our team member, Karen Rountree, involving a worker from a temp service, and she provided his number. And that was sent at 12.19, Mr. Plyman found out about the incident at 11.53 a.m. So at the very longest, it took him 26 minutes to call HR and inform them of the allegation. He did not violate the harassment policy. As for— There's a good bit of discussion in the briefing about there being a three-hour time frame. Your position is that that is incorrect between the time he knew that there had been some sort of complaint and the actual call to HR? There were other supervisors at AVI, Erica Bussell, and there was also Michelle Akridge. Both of them were made aware. Brian Plyman was not made aware until 11.53 a.m. I think the three-hour time reference also is the time between when AVI first learned of the complaint and the time that it informed PeopleReady that Ms. Cody was never to be allowed back on-premises at DHL. There was a three-hour time gap there. Had Michelle Akridge—I'm not sure I'm pronouncing that correctly—who was aware at an earlier time frame, is that correct? Had she been told by Mr. Plyman in the past not to call HR but to come to him if there was a complaint so that he could look into it first? That was what she had testified to, that she was under the impression— She didn't, I'm sorry. That's what Ms. Akridge had testified to. Yes, and she is an employee of AVI, right? She is an employee and supervisor at AVI. So that was her understanding, that she had been asked by Plyman not to follow the policy but instead to come to him with the information first. Right. That's what she testified to. And what happened was, no, she did not contact HR. She had somebody investigate the complaint. And the allegation from opposing counsel in their brief is that Ms. Akridge learned about the complaint regarding Ms. Cody from another temporary worker approximately 7 a.m. that morning. And so even though she didn't contact HR, Ms. Cody had been removed from the premises and people already had been told she may never return shortly after noon. So within about five to six hours, Michelle Akridge took action to remove Hope Cody from the workplace. Now, there's the references about the first time didn't work. Well, in Dover City of Detroit, the first response from the employer was not to involve building security. It was not to call the police. And as a result, there was additional harassment. What's wrong with a rule that ties what should be the response to the nature of the harassment? So in some of the cases you cited where there was more of a delay, I would assert that the allegations of harassment were largely just speech and harassing speech. In this case, though, it was a physical act that in many respects was a crime. So what's wrong with the rule that in that circumstance, maybe the employer should be even more aggressive? Do you have in terms of its response? Do you have a case that has analogous facts like this where it was essentially a physical assault and the response was found reasonable? Well, interestingly, the Hawkins case, which Ms. Roundtree cites extensively, has those facts. There were multiple plaintiffs in that case, and one of them was Ms. Hawkins. And Ms. Hawkins claimed that the harasser had poked or touched her breast. And ultimately, the employer removed the serial harasser who had a prior history of harassment from her work area nine days, nine days after she complained. And the Sixth Circuit affirmed summary judgment in favor of the employer finding that was still sufficient. And the point being that the employer didn't fail to act. In this case, ABI certainly didn't fail to act. Even if it took them 21, 22 hours to permanently remove Ms. Cody from the workplace, their conduct did not represent indifference or unreasonableness. They still acted swiftly to get her out of the workplace. And they ultimately did so. Well, I'm looking at the email from Heather Migliosi, I think it is, to Mr. Pleman that talks about the failure to observe the policy. You know, just briefly, let me just replicate some of it because I would like your response that Karen is upset that after she gave the details of the incident to HOPE, HOPE was not sent home immediately, that Karen had to continue working with her for the rest of that first shift. And the HR director says, I 100% agree with her on that, and then adds a parenthetical. This is the problem when I'm not contacted as soon as a complaint is received, like the policy states. I've been over this with Acreage several times. HOPE should have been escorted out as soon as Karen explained in detail what occurred. When a complaint is as egregious as Karen's, you immediately remove the accused, suspend pending investigation, or in this situation, advise there was a serious complaint that we need to investigate and have her leave. Why was AVI's failure to follow these steps not unreasonable? As an initial matter, Ms. Migliosi did not understand the facts when she wrote that email because the record shows that three or four separate employees had confirmed that Ms. Cody had already left for the day. In fact, Ms. Bussell had testified that that morning, Ms. Cody let her know that she was feeling ill and that she allowed her to go home. Ms. Roundtree, in her testimony, said she doesn't know what time she left on October 20, which was the day the incident was reported, but she doesn't recall having any interaction with her. Should they have reported it to HR immediately? Absolutely. Heather will be the first one to tell you that. She was obviously not happy that they didn't do so, but does that give rise to liability? As the district court said, Roundtree has failed to point to any case in which a court has held that an employer's response can only be considered prompt and appropriate if it complies with its internal policy. Ultimately, the standard here in this case is whether AVI failed to act or whether it manifested an indifference or unreasonableness. The question ultimately is, did AVI take action that was reasonably calculated to end the incident? AVI absolutely did so. They ensured that she was gone. They didn't have to remove her the day it was finally reported because she was already gone. And then it took steps... What happened to the provision of the written information about that this woman was banned that Ms. Roundtree had requested? Yeah, so that is addressed in our brief and in the record. And the last day that Ms. Roundtree worked for AVI, which was October 20th, that's when she left AVI that day. She spoke that night. I'm sorry, it was October 20th. She spoke with Heather Bingliozzi and she testified in her deposition that Heather told her Brian Plyman would have written documentation from PeopleReady stating that Cody would not return to AVI. It'll be ready for her when she returned to work. And that is at page ID 241. What's interesting is that Ms. Bingliozzi told Ms. Roundtree that. And the next day, Ms. Roundtree texts Brian Plyman and says she's going to come into work on Saturday and she'll be back into work on Monday as scheduled. So Heather's told her that we have that communication from PeopleReady and we'll give it to you when you come back to work. She didn't protest that. She didn't say email it to me. In fact, she sent an email that day, a text message that day saying I'm going to come in on Saturday and I'll be here on Monday. And then after that, the next day, October 22nd, she texts and says, well, I've changed my mind. I'm not going to come in on Saturday. And that was the last text message we received from her. Nobody in management received any further communication from her between October 22nd and October 28th. October 28th was the day that Ms. Bingliozzi in her voicemail said, please call me or Brian, left both of their phone numbers for her and said we need to hear from you. And the whole issue was they didn't know what her status was. They wanted to have a dialogue with her. And in response, they simply get a text message saying I didn't respond. But as the district court pointed out, after she sent that, the next day, it's not like she showed up for work or called off work. She was no call, no show again the next day after that text message was sent. She had made a decision. She wasn't coming back to work. And the fact of the matter is she was a three-day no call, no show. She had stopped communicating. She had stopped reporting to work. And this case is very similar to the Nance v. Goodyear case, Sixth Circuit case from 2008, where the employer policy said no call, no show for seven days is considered a resignation. And there, the employer... What about the fact that what she said is we need to hear from you? And then they did hear from her. They got her text message that said, please tell them that I have not resigned. And that is hearing from them, right? Well, she said, please call us. Well, in the end, she said, we must hear from you on this issue. And what they did was they did hear from her. They got a text message that said, I have not resigned. They did receive that text message, but they didn't receive a phone call, as I think she requested. And they hadn't had any... Despite the fact that Brian Plyman had left her two voicemails in the prior week, one text message, Heather called her twice with voicemails asking her to please call them. That's at least five communications in which Ms. Roundtree did not communicate with them. And then when she's told, please call us, and here's our numbers, she doesn't do so. She simply sends a text message. And then the next day, she's no call, no show. So under... What's the point of the rule that you have to call rather than text? What's the point of that policy? Why do you want to hear the voice? So you can have a dialogue with the employee, which in this circumstance is very important because they don't know what her status is. Why can't you have the dialogue via text? Why not respond via text? Well, if you're not resigning and you're not coming into work, what are you doing? Yeah, absolutely. I don't disagree with that. But what I do think is it's more efficient to dialogue. And it's not uncommon for employers to have these policies where you have to call, you can't text. And that applies to all employees. It's an unwritten policy. And so the point of the policy and the point of the request is so that Ms. Roundtree would actually pick up the phone, call them, and they could have an actual dialogue with her, which she had really deprived them of for the prior week because she just refused to communicate with them. And she her deposition. See, she said, I didn't trust them. So I wasn't going to communicate with them. And then she starts to apply for a job. And that's in the record that after she had told them I'm coming into work Saturday and Monday, she applied for a job. And then all of a sudden she changes her story and says, I'm not coming in on Saturday. Before your time is up, I would like you to address the costs of the bill of costs. My understanding is that the record establishes that Ms. Roundtree had about $108 in her account and that she said that she worked 50 hours a week and she lived from paycheck to paycheck. I'm struggling with the issue of cost because I'm looking at how large AVI is. The instruction here is to look at all the factors that relate to this case. And we know that AVI has, according to Indeed.com, 5,000 to 10,000 employees. We know that they have annual revenues of well over $500 million. And I know they've employed an experienced and well-known law firm that bills appropriately for their experience. And I'm concerned about this idea that there is pretty considerable expense put into trying to get a cost award that is way overshadowed by the expense that AVI paid to counsel to do a 28-page bill of cost to fight the whole thing. How does that fit within the context of this case in which you fairly concede that this was a good faith claim? This was not a slam dunk case. I would like you to address this fight over the cost of the case in terms of a woman who is, in my estimation, clearly indigent. So, first of all, I think under the law, I'll talk about the law, then the practical answer. And the law says that we're entitled to that. We're presumptively entitled to recover our cost, in this case, fairly limited cost, albeit in the scope of how much she earns, a significant sum of money. I don't dispute that. And the court has said indigency is one factor, but the district court ruled that she has an income flow and can eventually pay it over time. As a practical matter, employers often file a bill of cost and then attempt to resolve the appeal because they filed a bill of cost. And there's oftentimes a dispute over that, and it's used as part of negotiations. But at the end of the day, when an employee sues an employer, an employer obviously doesn't get to recover its attorney's fees. It has a legal right to recover the costs that it incurred in ABI, in this case, simply attempted to recover the cost that it had incurred consistent with what it's allowed under the law. And has action been taken against Ms. Roundtree to attempt to collect that? No, there's been no collection action. Are you in any discussions with the opposing side about resolving that case and the issue? Yes. Well, we had those discussions. I don't think we've had any discussions regarding that since the Sixth Circuit mediation. I believe it was in December, if I'm correct. Are you open to discussing it again? Absolutely. Okay. Thank you. Another question, if you'll help me, not related to cost, but back to the retaliation claim. What kind of warning, if any, did the company give to Ms. Roundtree that if she did not call, she would lose her job? Well, I believe that was part and parcel of the voicemail that Ms. Migliosi left for her, in which she said, please call us, provide the phone numbers, and told her, if you do not call, we'll consider it a voluntary resignation. In addition, you have the attendance policy, which specifically says, if you're no call, no show on one occasion, it is considered voluntary resignation. Ms. Roundtree admitted receiving that policy and understanding that was the policy. Even though she was three-day no call, no show, ABI did not treat her as having resigned her employment. It gave her another opportunity, but she didn't return to work. She didn't call anybody. And so, it's our position that under the Hammond case, that she constructively resigned her employment. Does your record reflect that it was a constructive resignation, or does your record reflect that it was a termination? I believe the term is job abandonment that's used on the employee profile. And that's what she would have found online. I understood that when she went about returning her badge and her uniform, the information online said that she had been terminated. Is that wrong? And point me in the record where I might get that correctly understood. Yeah, I'm not sure where she would have found that online. I know that there was a text message that was sent from Ms. Pullens to Ms. Roundtree asking her to return her badge. The word termination wasn't used, but Ms. Roundtree probably reasonably interpreted that. And this is how she testified that she had been terminated because we were asking for her badge back. So, I don't think there's anywhere in the record where it's specifically said that ABI records reflected termination because they didn't. It was a voluntary resignation. Any further questions? No. Thank you. Rebuttal, Ms. Lewis? Yes, thank you. For my follow-ups, I'd like to look at them through the lens of the pretext analysis. So, to establish pretext is that they have no basis in fact, did not actually motivate the employer's challenged conduct or were insufficient to warrant the challenged conduct. So, Plyman had testified that the reason that he wanted to actually call her instead of have a text was so he could find out if she had COVID. So, he could ask her COVID clearing questions. He has also previously testified that he didn't receive the text, which goes to his credibility. The voicemail from Ms. Migliosi did not specify that a call was necessary. She set the stage for the conditions and Ms. Rountree continuing her employment were making it clear they weren't going to fire her for the no-call, no-show. So, looking at all of that and the fact that they never did send her the written proof, that all rings the pretext bells going towards it. How is it sufficient to warrant for the no-call, no-show when she did what she was told she had to do to keep her job, but then they still relied on the no-call, no-show? Does that have anything to do, counsel, with having a daily requirement to call or contact? Is that the basis of that decision? And if so, what is your response to that? Plyman said that since COVID, you had to call in every day. And my response is he clearly knew this wasn't about COVID. He knew why she was out. I'd also like to point out real quick that under KCRA retaliation cases, under Asbury University versus Powell, it's about whether a good faith report was made, the retaliation claims not dependent on the success of the base KCRA claims. All right. Thank you. Yes. Thank you both. We find this a difficult case, but we appreciate your argument and your willingness to continue discussions and your briefing. And it will be taken under advisement and an opinion rendered in due course.